# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

**MICHEAL HEBERT (#263630)**                          **CIVIL ACTION NO.**

**VERSUS**                                            **20-616-BAJ-SDJ**

**DARREL VANNOY, et al.**

## NOTICE

Please take notice that the attached Magistrate Judge's Report has been filed with the Clerk of the U. S. District Court.

In accordance with 28 U.S.C. § 636(b)(1), you have 14 days after being served with the attached report to file written objections to the proposed findings of fact, conclusions of law, and recommendations set forth therein. Failure to file written objections to the proposed findings, conclusions, and recommendations within 14 days after being served will bar you, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court.

ABSOLUTELY NO EXTENSION OF TIME SHALL BE GRANTED TO FILE WRITTEN OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT.

Signed in Baton Rouge, Louisiana, on September 13, 2023.

_____

**SCOTT D. JOHNSON**
**UNITED STATES MAGISTRATE JUDGE**

# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

MICHEAL HEBERT (#263630)                    CIVIL ACTION NO.

VERSUS                                      20-616-BAJ-SDJ

DARREL VANNOY, et al.

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Before the Court is a Petition Under 28 U.S.C. § 2254 for a Writ of Habeas Corpus By a Person in State Custody, filed by Michael Hebert, who is proceeding *pro se* and who is confined at the Louisiana State Penitentiary in Angola, Louisiana.[1]  In his Petition, Petitioner argues the following five grounds for relief: (1) insufficient evidence, (2) the state court erred in allowing the jury to hear statements Petitioner made against his parents to demonstrate criminal intent, (3) prosecutorial misconduct, (4) ineffective assistance of counsel, and (5) ineffective assistance of appellate counsel.[2]  Respondent, the State of Louisiana, filed an Answer to the Petition and Memorandum in support.[3]  For the following reasons, it is recommended that the Petition be denied.  There is no need for oral argument or for an evidentiary hearing.

## I.    Procedural History

On September 11, 2013, Petitioner was indicted for second degree murder in violation of La. R.S. 14:30.1.[4]  Following a jury trial, Petitioner was found guilty of second-degree murder, and on May 22, 2015, Petitioner was sentenced to life imprisonment at hard labor without the benefit of probation, parole, or suspension of sentence.[5]  Petitioner appealed his conviction to the

---

[1] R. Doc. 1.
[2] R. Doc. 1, pp. 4-5.
[3] R. Docs. 9 & 10.
[4] R. Doc. 12-2, p. 49.
[5] R. Doc. 12-2, pp. 20-21.

Louisiana First Circuit Court of Appeal, which affirmed his conviction and sentence on April 7, 2016.[6]  Petitioner then filed an application for supervisory writs with the Louisiana Supreme Court,[7] which was denied on April 24, 2017.[8]

On April 24, 2018, Petitioner filed his first application for post-conviction relief with the trial court.[9]  The Commissioner recommended denial of Petitioner's PCR application on July 25, 2018,[10] which recommendation was adopted by the trial court on February 6, 2019.[11]  Petitioner then filed an application for writs of supervisory review with the First Circuit.[12]  The First Circuit denied Petitioner's writ application on July 11, 2019.[13]  Following this denial, on or about August 5, 2019, Petitioner filed for writs of supervisory review with the Louisiana Supreme Court.[14]  The Supreme Court denied Petitioner's request on August 14, 2020.[15]  In the interim, on or about December 2, 2019, Petitioner filed a second PCR application in the trial court, alleging that the jury venire for his trial was not a fair cross-section of the community.[16]  Adopting the recommendation of the Commissioner,[17] the trial court denied this application on June 3, 2020.[18]  Petitioner did not seek further review of this decision by the trial court.  The instant Petition followed.

## II.    Factual Background

The facts, as accurately summarized by the First Circuit, are as follows:

---

[6] R. Doc. 11-1, pp. 13-29.
[7] R. Doc. 11-1, pp. 2-11.
[8] R. Doc. 11-1, p. 1.
[9] R. Doc. 16-2, pp. 10-31.
[10] R. Doc. 16-1, pp. 11-20.
[11] R. Doc.1-2, p. 83; R. Doc. 12-1, P. 29.
[12] R. Doc. 1-2, pp. 92-105.
[13] R. Doc. 11-8, p. 15.
[14] R. Docs. 11-7, pp. 92-98 and 11-8, pp. 1-12.
[15] R. Doc. 11-9, pp. 4-5.
[16] R. Doc. 12-1, p. 9; R. Doc. 12-1, pp. 20-45.
[17] R. Doc. 12-1, pp. 9-15.
[18] R. Doc. 1, p. 3.

The defendant, who was in his early fifties, lived at home with his parents, Wayne Hebert, Sr., and Earline Hebert. They lived on Chateau Drive in the Broadmoor area of Baton Rouge. Wayne and Earline also had a son and daughter who lived in Texas, Wayne Gaston Hebert, II, (Gaston) and Melanie Sanders. In 2013, Wayne and Earline put their home on the market to sell, because they planned on moving to Texas to be near Melanie and Gaston. The defendant was upset that his parents were moving. The defendant did not have a job and relied on his parents for financial support. The defendant was estranged from his father. When Wayne and Earline showed the defendant a three-bedroom house that they would purchase for him when they moved to Texas, the defendant told them he did not want the house because the shed in the backyard was too small. To prepare their home to be shown by a realtor, Wayne and Earline had to clear the house of many items and furniture. Gaston agreed that he would drive in from Texas to help out his parents with moving the furniture out of the house and into the garage. Gaston and Earline had also briefly discussed that Gaston should talk with the defendant about the move to help allay any trepidation the defendant might have had about this transition in his life.

On June 15, 2013, at about 6:00 a.m., Gaston was at his parents' home in Baton Rouge, moving furniture to the garage. (Gaston had arrived in Baton Rouge from Texas the night before at about 10:30 p.m.) Several minutes later, the defendant went into the backyard and began talking with Gaston. The defendant became upset with something that Gaston had said. The defendant went back into the house and went upstairs, to his bedroom. Moments later, the defendant went downstairs, walked through the kitchen past his mother, and opened the porch door that led to the backyard. The defendant called out "Gaston" and, without warning, shot Gaston five times with a Glock .357 semi-automatic handgun that he owned. Gaston died in the backyard.

The defendant called 911. When the operator transferred the call to the police, the defendant stated that his brother started attacking him, and he had to shoot him. When the police arrived at the house, they took the defendant into custody without incident. Gaston was lying on the concrete driveway in the backyard. There was an aluminum baseball bat about three or four feet away from Gaston's right hand. Seven spent Federal Cartridge cases were scattered around the driveway. Only one cartridge case was next to Gaston's body. Sergeant Dwayne Strougther with the Baton Rouge Police Department, who spoke to the defendant at the scene, testified that the defendant told him that when he (the defendant) tried to leave, his brother came at him with a baseball bat, so he had to shoot him.

Wayne testified that when he heard the shooting, he grabbed the bat from underneath his bed and headed out to the backyard with it. Shocked at seeing Gaston on the ground, Wayne thought he dropped the bat, but was not sure exactly what he did with it.

DNA swabs were taken of the baseball bat handle. Tammy Rash, an expert in DNA analysis, testified that the DNA profile obtained on the bat handle was a mixture of two individuals. Wayne could not be excluded as a contributor, and the other contributor was present at such a low concentration that a valid DNA profile could not be obtained. Rash also testified that Gaston could be excluded as the predominant contributor to the DNA on the bat.

The defendant gave a statement at the police station. According to the defendant, he shot Gaston because Gaston had grabbed his head. The defendant went upstairs to get his keys, and when he went back outside to get in his truck, Gaston walked "fast" toward him. The defendant saw Gaston's face and knew that Gaston was coming to beat him up. It was at this point that the defendant shot Gaston.

The defendant did not testify at trial.[19]

### III.  Law & Analysis[20]

#### a.  Review of Claim Two is Precluded

Petitioner argues the trial court erred in allowing statements previously made to his parents to be introduced at trial.[21]  He does not allege that introduction of the evidence violated any federal law, nor was the claim presented to the state courts as involving federal law.[22]  Claim two involves the evidentiary rules of Louisiana, a question of purely state law, which is not subject to federal habeas review.[23]  "In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."[24] A federal court may not grant habeas relief based on an alleged error in the interpretation or application of state law.[25]

---

[19] *State v. Hebert*, 2015-1455 (La. App. 1 Cir. 4/7/16), *writ denied*, 2016-0834 (La. 4/24/17), 220 So. 3d 741.
[20] The State concedes that the Petition is timely and does not argue that any claims are unexhausted.
[21] R. Doc. 1-1, pp. 10-13.
[22] R. Docs. 1-1, pp. 10-11; 1-11, pp. 10-11.
[23] R. Doc. 12, pp. 18-19.
[24] 28 U.S.C. § 2254(a); *Estelle v. McGuire*, 502 U.S. 62, 68 (1991).
[25] *Estelle*, 502 U.S. at 68; *see also Wilkerson v. Whitley*, 16 F.3d 64, 67 (5th Cir. 1994) (a federal court does "not sit as [a] super state supreme court in a habeas corpus proceeding to review errors under state law") (citation and quotation omitted); *Swarthout v. Cooke*, 562 U.S. 216, 218 (2011) (federal habeas review does not lie for errors of state law).

Even at this Court, Hebert has not provided any indication that he would like this claim to be analyzed under federal law.  Accordingly, claim two is subject to dismissal.

### b.  The Claims Fail on the Substance[26]

#### i.  AEDPA

Under 28 U.S.C. § 2254(d), an application for a writ of habeas corpus shall not be granted with respect to any claim that a state court has adjudicated on the merits unless the adjudication has "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[27]  Relief is authorized if a state court arrived at a conclusion contrary to that reached by the Supreme Court on a question of law or if the state court decided a case differently than the Supreme Court on materially indistinguishable facts.[28]

Relief is also available if the state court has identified the correct legal principle but has unreasonably applied that principle to the facts of the petitioner's case or has reached a decision based on an unreasonable factual determination.[29]  Mere error by the state court or this Court's mere disagreement with the state court determination is not enough; the standard is one of objective

---

[26] Though in his Petition, Petitioner asked for a stay to allow him to exhaust additional claims (R. Doc. 1, p. 3), those claims have, at this point, been denied on procedural grounds by the state court, and are now not subject to review on the merits in this Court. R. Doc. 12-1, pp. 15, 17.  Petitioner has also not argued for review of these claims or argued that cause and prejudice exists, such as to render the claims reviewable.

[27] Each claim discussed in this Report was decided by *a* state court on the merits. Because there is a decision on the merits by a state court, deference to that decision generally applies under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  The deferential standards of review apply to claims adjudicated on the merits by the state courts—the statute does not distinguish between claims fully exhausted and claims simply "adjudicated on the merits in State court." 28 U.S.C. § 2254(d).  *See Bedoya v. Tanner*, No. 12-1816, 2019 WL 1245655 at *10-11 (E.D. La. Feb. 20, 2019) (discussing AEDPA's standards of review even though some claims were only exhausted at the state trial court level).

[28] *Williams v. Taylor*, 529 U.S. 362, 413 (2000).

[29] *See Montoya v. Johnson*, 226 F.3d 399, 404 (5th Cir. 2000).

reasonableness.[30]  State court determinations of underlying factual issues are presumed to be

correct, and the petitioner has the burden to rebut that presumption with clear and convincing

evidence.[31]  The last reasoned state court opinion regarding Petitioner's claim one is from the

Louisiana First Circuit Court of Appeals, and for claims three, four, and five, it is the decision

from the state trial court on Petitioner's PCR application, so the Commissioner's recommendation

is the relevant reasoned opinion for AEDPA deference.[32]

### ii.   Claim One: Sufficiency of the Evidence

In his first assignment of error, Petitioner contends that mitigating factors existed, such that

he should have been convicted of a lesser offense or, alternatively, acquitted.[33]  The applicable

legal standard, however, requires that this Court consider whether the evidence was sufficient to

prove second degree murder, which was the verdict in his case.[34]  A conviction based on

insufficient evidence cannot stand as it violates due process.[35]  In a federal habeas corpus

proceeding, the Supreme Court's decision in *Jackson v. Virginia*[36] provides the standard for testing

the sufficiency of the evidence.  The question "is whether, after viewing the evidence in the light

most favorable to the prosecution, *any* rational trier of fact could have found the essential elements

of the crime beyond a reasonable doubt."[37]  Further, the federal habeas court's consideration of the

---

[30] *Id.  See also Williams*, 529 U.S. at 409 ("[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable").
[31] 28 U.S.C. § 2254(e)(1).
[32] *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018) ("when the last state court to decide a prisoner's federal claim explains its decision on the merits in a reasoned opinion…a federal habeas court simply reviews the specific reasons given by the state court and defers to those reasons if they are reasonable.").
[33] R. Doc. 1-1, pp. 5-6.
[34] *Roberson v. Vannoy*, No. 19-12938, 2020 WL 5538901, at *8-9 (E.D. La. Aug. 14, 2020).
[35] *See* U.S. CONST. amend. XIV.
[36] 443 U.S. 307 (1979).
[37] *Id*. at 319 (emphasis in original), citing *Johnson v. Louisiana*, 406 U.S. [356] at 362 [1972]).

sufficiency of the evidence is limited to a review of the record evidence offered at the petitioner's state court trial.[38]

State law defines the substantive elements of the offense, and a state judicial determination that the evidence was sufficient to establish the elements of the offense is entitled to great weight on federal habeas review.[39] The First Circuit accurately described the standard of *Jackson* noted above[40] and undertook a detailed analysis of the claim:

> When analyzing circumstantial evidence, La. R.S. 15:438 provides that the factfinder must be satisfied the overall evidence excludes every reasonable hypothesis of innocence.
>
> Second degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. Guilty of manslaughter is a proper responsive verdict for a charge of second degree murder. Louisiana Revised Statute 14:31(A)(1) defines manslaughter as a homicide which would be either first degree murder or second degree murder, but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a manslaughter if the factfinder finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed. The existence of "sudden passion" and "heat of blood" are not elements of the offense but, rather, are factors in the nature of mitigating circumstances that may reduce the grade of homicide. Manslaughter requires the presence of specific intent to kill or inflict great bodily harm.
>
> Specific intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. Such state of mind can be formed in an instant. Specific intent need not be proven as a fact, but may be inferred from the circumstances of the transaction and the actions of defendant. The existence of specific intent is an ultimate legal conclusion to be resolved by the trier of fact.
>
> ***
>
> It is the defendant who must establish by a preponderance of the evidence the mitigating factors of sudden passion or heat of blood to reduce a homicide to manslaughter. Further, the killing committed in sudden passion or heat of blood must be immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Thus, the evidence at trial had to establish that the provocation was such that it would have deprived an average person of his self-control and cool reflection.

---

[38] *Ramirez v. Dretke*, 398 F.3d 691, 694 (5th Cir. 2005); *Knox v. Butler*, 884 F.2d 849, 852 n.7 (5th Cir. 1989).

[39] *Dickinson v. Cain*, 211 F.3d 126, *5 (5th Cir. 2000); *Hawkins v. Lynaugh*, 844 F.2d 1132, 1134 (5th Cir. 1988).

[40] *State v. Hebert*, 15-KA-1455 (La. App. 1st Cir. 4/7/16) 2016 WL 1394242, at *2.

There was no testimony or physical evidence that Gaston physically provoked the defendant in any way. The defendant did not testify at trial. Thus, the defense did not establish the mitigating factors of sudden passion or heat of blood during the morning of the shooting. The testimony at trial established that the defendant appeared to have gotten angry while talking to Gaston in the backyard. The defendant then left the scene and went back inside; he went upstairs momentarily and came back downstairs. The defendant then walked a few feet outside and began shooting at Gaston from a distance. Earline Hebert, the mother of Gaston and the defendant, testified that she was in the kitchen, watching through the bay window the defendant and Gaston talking in the backyard prior to the shooting. It appeared they may have been arguing. According to Earline, she saw Gaston patting the defendant's shoulder, causing her to think that they were "making peace." At that moment, Earline heard the defendant say, "Don't you ever put your hand on me again, or I'll shoot you." Earline then heard Gaston reply that the defendant would not want to do that because he would be incarcerated for the rest of his life. The men walked away from each other, the defendant toward the house and Gaston back toward the garage, where he had earlier been moving furniture.

According to Earline, the defendant went upstairs, came back downstairs, walked past her, and opened the porch door (to the backyard). The defendant was only two or three feet outside of the door when he yelled "Gaston" and began firing his handgun. Gaston had his back toward the defendant when the defendant began shooting. Earline saw Gaston moving around the driveway, trying to avoid being shot. According to Earline, Gaston was about eight to ten feet away from the defendant and walking toward the garage when the defendant opened fire. Earline did not see a bat or anything else in Gaston's hands when he was being shot.

Earline's account of the shooting was at odds with the defendant's account of what had occurred. Following the shooting, the defendant was brought to the police station and provided a video statement. According to the defendant, he and Gaston were arguing in the backyard. Gaston grabbed the defendant by the head with both hands. This angered the defendant, causing him to go inside. The defendant went upstairs to get his keys, not his gun. According to the defendant, he already had his gun on his person when he was talking to Gaston in the backyard. The defendant's plan was to get in his truck and drive away from the scene. When the defendant went back into the backyard, however, to get in his truck, Gaston began walking "fast" toward him. It is at this point that the defendant repeatedly shot Gaston. The defendant did not know if Gaston had anything in his hands, and during his entire interview, he never mentioned or made any reference to a baseball bat even though he had earlier told the police officer who initially detained him at the scene that Gatson had come at him with a bat.

***

When self-defense is raised as an issue by the defendant, the State has the burden of proving, beyond a reasonable doubt, that the homicide was not perpetrated in self-defense. A person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know

that he desires to withdraw and discontinue the conflict. The guilty verdict of second degree murder indicates the jury accepted the testimony of the prosecution witnesses insofar as such testimony established that the defendant did not kill Gaston in self-defense.

The jurors clearly did not believe the claim of self-defense. They may have determined the aggressor doctrine applied, since the defendant escalated the conflict by arming himself. More likely, under the facts of this case, the jury may have determined the defendant did not reasonably believe he was in imminent danger of losing his life or receiving great bodily harm when he shot Gaston and did not act reasonably under the circumstances. When the defendant left the backyard, there was no reason for him to return. He could have stayed inside or walked out the front door and taken a walk. Instead, he went back outside to the backyard and confronted Gaston. Moreover, even if the defendant had every right to be in his backyard (which he did) as Gaston did, the defendant could not have shot Gaston in the reasonable belief that he was in imminent danger of losing his life or receiving great bodily harm. Gaston was not armed with anything and, if the defendant's version of events is to be believed, the most Gaston did was walk quickly toward the defendant before the defendant shot him.

Dr. Cameron Snider, who performed the autopsy on Gaston, testified that Gaston had been shot five times. Three of the bullet wounds entered Gaston from his back and two from the front. Gaston was shot in the front of each arm and twice in the back of his left arm. He was also shot in his lower left back, which was the shot that killed him. According to Dr. Snider, none of the wounds had stippling or gunshot residue. Thus, while the distance of the shots were indeterminate, Dr. Snider made clear that he did not have evidence of a close or medium gunshot range.

Based on the testimony, a rational trier of fact could have reasonably concluded that the killing of Gaston was not necessary to save the defendant from the danger envisioned by La. R.S. 14:20(1) and/or that the defendant had abandoned the role of defender and taken on the role of an aggressor and, as such, was not entitled to claim self-defense. In finding the defendant guilty, it is clear the jury rejected the claim of self-defense and concluded that the use of deadly force under the particular facts of this case was neither reasonable nor necessary.

When a case involves circumstantial evidence and the jury reasonably rejects the hypothesis of innocence presented by the defense, that hypothesis fails, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt. It is clear from the guilty verdict that the jury rejected the theory that the defendant was so angry when he shot Gaston that he was deprived of his self-control and cool reflection. Questions of provocation and time for cooling are for the jury to determine under the standard of the average or ordinary person with ordinary self-control. If a man unreasonably permits his impulse and passion to obscure his judgment, he will be fully responsible for the consequences of his act.

The defendant noted in brief that an explanation for his shooting Gaston was that he was provoked by a comment Gaston had made to him while they were outside, although he failed to indicate either the nature or content of this alleged

comment. Mere words or gestures, no matter how insulting, will not reduce a homicide from murder to manslaughter.

The jury heard the testimony and viewed the evidence presented at trial and found the defendant guilty as charged. As noted, the defendant did not testify. In the absence of internal contradiction or irreconcilable conflict with the physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient to support a factual conclusion. Moreover, the trier of fact is free to accept or reject, in whole or in part, the testimony of any witness. The trier of fact's determination of the weight to be given evidence is not subject to appellate review. An appellate court will not reweigh the evidence to overturn a factfinder's determination of guilt. We are constitutionally precluded from acting as a "thirteenth juror" in assessing what weight to give evidence in criminal cases. The fact that the record contains evidence which conflicts with the testimony accepted by a trier of fact does not render the evidence accepted by the trier of fact insufficient. The guilty verdict indicates the reasonable determination by the jury that, for whatever reason he had, the defendant shot Gaston multiple times with the specific intent to kill him and in the absence of the mitigating factors of manslaughter. The jury's guilty verdict of second degree murder was necessarily a rejection of any of the responsive verdicts, including manslaughter.

After a thorough review of the record, we find that the evidence supports the jury's unanimous guilty verdict. We are convinced that viewing the evidence in the light most favorable to the State, any rational trier of fact could have found beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, that the defendant was guilty of the second degree murder of Wayne Gaston Hebert, II.[41]

The Louisiana Supreme Court then denied relief without assigning additional reasons.[42]

The First Circuit accurately noted the standard set forth in *Jackson v. Virginia* for analyzing claims of insufficient evidence. "[A] federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court…. Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold."[43] Moreover, as the United States Fifth Circuit Court of Appeals has observed, "a state prisoner's burden is especially heavy on habeas review of the

---

[41] *State v. Hebert*, 2015-1455 (La. App. 1 Cir. 4/7/16) (citations omitted).

[42] *State v. Hebert*, No. 2016-0834 (La. 2017) 220 So.3d 741.

[43] *Cavazos v. Smith*, 132 S.Ct. 2, 4 (2011).

sufficiency of the evidence. The jury's finding of facts will be overturned only when necessary to preserve the fundamental protection of due process of law."[44] Further, because the state court's decision applying the already deferential *Jackson* standard must be assessed here under the strict and narrow standards of review mandated by the AEDPA, the standard to be applied by this Court is in fact "twice-deferential."[45]

Petitioner was charged with and convicted of second-degree murder. Under Louisiana law, second-degree murder is defined as "the killing of a human being … when the offender has a specific intent to kill or to inflict great bodily harm."[46] The phrase "specific intent" is defined as the state of mind in which the perpetrator "actively desired the prescribed criminal consequences to follow his act or failure to act."[47] As noted by the First Circuit, under Louisiana law, intent need not be proven directly but may be inferred from the actions of the accused and the circumstances surrounding those actions. Specific intent to kill can be implied by the intentional use of a deadly weapon, such as a knife or a gun.[48] Petitioner has never argued that he did not, in fact, kill Gaston. Rather, Petitioner relies on his arguments that the evidence was insufficient to demonstrate that he had the specific intent to kill and that, even if he had the specific intent to kill, circumstances warranted mitigation to the lesser offense of manslaughter.

The First Circuit's review of the evidence, which relies heavily on the testimony of Earline Hebert, is also accurate. Earline Hebert testified that Petitioner stated to her "if Gaston is coming in this weekend, I'm going to shoot him."[49] This statement was made one to two weeks before

---

[44] *Perez v. Cain*, 529 F.3d 588, 594 (5th Cir. 2008) (quotation marks omitted).
[45] *Parker v. Matthews*, 132 S.Ct. 2148, 2152 (2012) ("In light of this twice-deferential standard…"); *see also Coleman v. Johnson*, 132 S.Ct. 2060, 2062 (2012).
[46] La. R.S. § 14:1(A).
[47] La. R.S. § 14:10(1).
[48] *State v. Collins*, 43 So.3d 244, 251 (La. App. 1st Cir. 2010) (citing *State v. Brunet*, 674 So.2d 344, 349 (La. 1996)).
[49] R. Doc. 12-6, p. 58.

Gaston was actually murdered.[50]  Earline's testimony regarding the series of events occurring on June 15, 2013, the date the murder occurred, was, in pertinent part, as follows.

> Gaston was patting Michael, just had his hand like that and a couple of times on the shoulder, and I thought, well this is it, they are making – he's making peace.  They are greeting each other, and then…Then I heard Michael scream, "Don't you ever touch me again. Don't you ever put your hand on me again, or I'll shoot you…." After Michael screamed, "I'll shoot you if you touch me again." … I heard Gaston say, "Oh, Michael. You wouldn't want to do that because you would be incarcerated for the rest of your life."[51]

Earline further testified that after that exchange, Petitioner and Gaston walked away from each other.  Afterwards, Earline testified that she "saw Michael just came down the stairs, and he walked by me and out the door, and he was about maybe two or three feet out the porch door to the yard, and I heard him yell, 'Gaston.'  I saw him raise a pistol, and I heard – saw the shooting.  I saw the bullet – I mean I heard the pows and I ran down those little steps, and I ran outside."[52] Before Michael went outside, "Gaston was walking toward the garage by the little the oak tree, and he was I guess maybe 8 or 10 feet away from Michael, and he was walking toward the garage…with his back to Michael."[53]

The foregoing evidence was clearly constitutionally sufficient to support a conviction of second-degree murder.  "Deliberately pointing and firing a deadly weapon at close range are circumstances which will support a finding of specific intent to kill."[54] Hebert claims that his state of mind was such that the evidence only supported a conviction of manslaughter, but that contention is not supported by the record.  It is true that Louisiana law provides that a defendant who would otherwise be guilty of second-degree murder can be found guilty of manslaughter if

---

[50] R. Doc. 12-6, p. 59.
[51] R. Doc. 12-6, p. 79-80.
[52] R. Doc. 12-6, p. 80.
[53] R. Doc. 12-6, p. 81.
[54] *State v. Bland*, 194 So.3d 679, 686 (La. App. 1st Cir. 2016) (citations omitted).

"the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection."[55]  However, "sudden passion" and "heat of blood" are mitigatory factors. The state does not bear the burden to disprove the mitigatory factors; rather, the defendant bears the burden to prove that they existed by a preponderance of the evidence.[56]

      As noted by the First Circuit, Petitioner did not testify, and the testimony of other witnesses, specifically Earline Hebert, did not support Petitioner's argument that he shot in the heat of the moment, considering that he left the scene, went upstairs, then returned, or the jury may have found the evidence indicated Petitioner was the aggressor.  Further, Earline testified that when Gaston was walking to the garage, immediately before he was shot, he had nothing in his hands.[57]  Therefore, a rational trier of fact could have found that the mitigatory factors were not established by any evidence, much less the required preponderance of the evidence.  In light of that fact, as well as the fact that the evidence was clearly constitutionally sufficient to support a conviction of second-degree murder for the reasons already explained, this contention fails.

      In summary, for the reasons explained by the Louisiana First Circuit Court of Appeal, when the evidence in this case is viewed *in the light most favorable to the prosecution*, it simply cannot be said that the guilty verdict was *irrational.* Therefore, Petitioner cannot show that the state courts' decision rejecting his claims was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.

---

[55] La. Rev. Stat. § 14:31(A)(1).
[56] *See, e.g.*, *Trosclair v. Cain*, No. 12-2958,  2014 WL 4374314, at *9 (E.D. La. Sep. 2, 2014) ("A defendant has the burden of proving these mitigating factors. Thus, ... the issue to be resolved is whether any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found that the mitigating factors were not established by a preponderance of the evidence." (quotation marks omitted)); *State v. Arias-Chavarria*, 49 So.3d 426, 431-32 (La. App. 5th Cir. 2010) ("the defendant is required to prove the mitigatory factors by a preponderance of the evidence").
[57] R. Doc. 12-6, p. 83.

Accordingly, under these doubly deferential standards of review, which must be applied by this federal habeas court, relief is not warranted on this claim.

### iii.   Claim Three: Prosecutorial Misconduct

Petitioner alleges that the prosecutor refused to reveal evidence and facts in their possession that was material and favorable to the defense.[58]  Petitioner contends that the prosecutor engaged in misconduct by not providing emails that Petitioner, himself, had written.[59]  He also alleges that the prosecutor engaged in misconduct by not having further testing done on the baseball bat Gaston had on the day he was killed and that the prosecutor contaminated the evidence by removing it from packaging and handling it during trial without gloves.[60]

### 1.   *Brady* Violation

Regarding the first claim of prosecutorial misconduct, Petitioner alleges that "[t]his case presents an issue of omitted evidence…while not in a Brady sense where the defendant was not aware of its existence or that it shows he did not commit the crime, but it was in possession of the state, [and] it was material as far as the Petitioner's degree of culpability…."[61]  However, Petitioner proceeds to apply *Brady* to his claims regarding prosecutorial misconduct.[62]  Based on Petitioner's allegations, the most appropriate method by which to analyze these claims is as a *Brady* prosecutorial misconduct claim, and this is, indeed, how the Commissioner at the state trial court analyzed the claim.[63]

The three components or essential elements of a *Brady* prosecutorial misconduct claim are as follows: "The evidence at issue must be favorable to the accused, either because it is

---

[58] R. Doc. 1-1, p. 12.
[59] R. Doc. 1-1, pp. 12-17.
[60] R. Doc. 1-1, pp. 17-18.
[61] R. Doc. 1-1, p. 12.
[62] R. Doc. 1-1, pp. 16-17.
[63] R. Doc. 16-1, pp. 13-14.

exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."[64] Because the emails were drafted by Petitioner himself, that evidence could not, per se, have been suppressed by the State.

After reviewing the applicable law, the Commissioner held that Petitioner had "failed to present any facts to support that the State withheld evidence that would have made a difference in his trial…."[65] The Commissioner accepted the State's argument that Petitioner was aware the emails existed because he created them; additionally, the jury had the opportunity to consider the conspiracy theories discussed in the emails due to the introduction of other evidence, so Petitioner could not show prejudice.[66]

This Court does not find that the state court unreasonably applied federal law in denying Petitioner's *Brady* prosecutorial misconduct claim. "All that is required of the prosecution under *Brady* and its progeny is that it notify the defense of the existence of potentially exculpatory evidence…."[67] Further, *Brady* does not require the Government to turn over exculpatory evidence if the defendant "knew or should have known the essential facts permitting him to take advantage of any exculpatory evidence."[68] Because Defendant was well aware of the existence of the emails, since he drafted them, his claim regarding the alleged *Brady* violation must fail.[69]

## 2. Contamination of Evidence

Petitioner's claim regarding the handling of the bat does not fit neatly with typical prosecutorial misconduct claims. Generally, a claim of prosecutorial misconduct presents a mixed

---

[64] *Banks v. Dretke*, 540 U.S. 668, 691 (2004) (citing *Strickler v. Green*, 527 U.S. 263, 281-82 (1999)).
[65] R. Doc. 16-1, p. 17.
[66] R. Doc. 16-1, p. 17.
[67] *Starns v. Andrews*, 2008 WL 11490465, at *4 (M.D. La. Sept. 26, 2008).
[68] *Id.*
[69] Further, the emails, discussed *infra*, were not exculpatory, nor did they provide impeachment evidence.

question of law and fact.[70]  Federal courts, generally, analyze prosecutorial misconduct claims in two steps: (1) did the prosecutor make an improper remark; and (2) if so, did the defendant suffer prejudice.[71]  "The prejudice step of the inquiry sets a high bar: Improper prosecutorial comments constitute reversible error only where the defendant's right to a fair trial is substantially affected."[72]  A claim of prosecutorial misconduct is actionable on federal habeas review only when the alleged misconduct so infected the trial with unfairness as to make the resulting conviction a denial of due process.[73]  Due process is only offended when the alleged conduct deprived the petitioner of his right to a fair trial.  A trial is fundamentally unfair if there is a reasonable probability the verdict might have been different had the trial been properly conducted.[74]  Generally, habeas corpus relief is available for prosecutorial misconduct only when the prosecutor's conduct is so egregious in the context of the entire trial that it renders the trial fundamentally unfair.[75]  The conduct must either be so persistent and pronounced, or the evidence so insubstantial that, but for the conduct, no conviction would have occurred.[76]

Petitioner does not complain that the handling of the bat at trial rendered the trial unfair.  Rather, he alleges further testing should have been performed and takes issue with the fact that the handling of the bat precluded post-conviction DNA testing.  With respect to this claim, the Commissioner found the allegation without merit noting as follows: "This Commissioner agrees with the State.  Petitioner's allegations of prosecutorial misconduct are without merit and he has failed to present any facts to support that the State withheld evidence that would have made a

---

[70] *Brazley v. Cain*, 35 Fed.Appx. 390, n. 4 (5th Cir. 2002) (citing *United States v. Emuegbunam*, 268 F.3d 377, 403-04 (6th Cir. 2001)).
[71] *Trottie v. Stephens*, 720 F.3d 231, 253 (5th Cir. 2013).
[72] *Id.* (internal quotation marks and citations omitted).
[73] *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).
[74] *Styron v. Johnson*, 262 F.3d 438, 454 (5th Cir. 2001).
[75] *Darden*, 477 U.S. at 181.
[76] *Kirkpatrick v. Blackburn*, 777 F.2d 272, 281 (5th Cir. 1985).

difference in his trial or that the bat was contaminated. The DNA analyst gave a lengthy testimony on the test results and why they were inconclusive."[77] The Commissioner did not provide any further detail regarding his denial of this claim.

The undersigned has found no support for a claim arising from the fact that the prosecutor did not seek further testing of the baseball bat. As noted by the Commissioner, DNA testing was performed and was inconclusive. Regarding the inability to conduct post-conviction DNA testing, "[t]here is no substantive due process right to post-conviction DNA testing."[78] Any right Petitioner may have had regarding post-conviction DNA testing arises solely under Louisiana law and does not implicate a federal constitutional issue.[79] Even if the handling of the bat was improper, Petitioner has failed to demonstrate that he suffered prejudice from the alleged inability to conduct post-conviction DNA testing on the bat. Rather, it appears impossible for Petitioner to make such a showing of prejudice because Louisiana's statute for post-conviction DNA testing provides for testing only in the event "[t]hat the applicant is factually innocent of the crime for which he was convicted,"[80] which Petitioner is admittedly not. Accordingly, Petitioner cannot demonstrate that he suffered prejudice from the prosecutor's handling of the baseball bat at trial.

### iv. Claims Four & Five: Ineffective Assistance of Counsel

A habeas petitioner who asserts that he was provided with ineffective assistance of counsel must meet the *Strickland* standard by affirmatively showing: (1) that her counsel's performance was "deficient", *i.e.*, that counsel made errors so serious that counsel was not functioning as the

---

[77] R. Doc. 16-1, pp. 17-18.
[78] *District Attorney's Office for Third Judicial District v. Osborne*, 557 U.S. 52, 72 (2009) (rejecting substantive due process right of "access to state evidence so that [petitioner] can apply new DNA-testing technology that might prove him innocent," and holding that there is no free-standing federal constitutional right to obtain post-conviction access to the state's evidence for DNA testing); *Emerson v. Thaler*, 544 Fed.Appx. 325, at n. 1 (5th Cir. 2013).
[79] *Johnson v. Thaler*, 2010 WL 2671575, at *3 (S.D. Tex. June 30, 2010) (citing *Trevino v. Johnson*, 168 F.3d 173, 180 (5th Cir. 1999) and *Richards v. District Attorney's Office*, 355 Fed.Appx. 826, 826 (5th Cir. 2009) (unpublished)).
[80] La. Code Crim. P. art. 926.1(B)(4).

"counsel" guaranteed the defendant by the Sixth Amendment; and (2) that the deficient performance prejudiced her defense, *i.e.*, that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial in which the result is reliable.[81]   The petitioner must make both showings in order to obtain habeas relief based upon the alleged ineffective assistance of counsel.[82]

To satisfy the deficiency prong of the *Strickland* standard, the petitioner must demonstrate that his counsel's representation fell below an objective standard of reasonableness as measured by prevailing professional standards.[83]   The reviewing court must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional competence and that, under the circumstances, the challenged action might be considered sound trial strategy.[84]    This Court, therefore, must make every effort to eliminate the distorting effects of hindsight and to evaluate the conduct from counsel's perspective at the time of trial.[85]   Great deference is given to counsel's exercise of professional judgment.[86]

If the petitioner satisfies the first prong of the *Strickland* test, his petition nonetheless must affirmatively demonstrate prejudice resulting from the alleged errors.[87]   To satisfy the prejudice prong of the *Strickland* test, it is not enough for the petitioner to show that the alleged errors had some conceivable effect on the outcome of the proceeding.[88] Rather, the petitioner must show a reasonable probability that, but for counsel's alleged errors, the result of the proceeding would have been different.[89]   The habeas petitioner need not show that his counsel's alleged errors "more likely than not" altered the outcome of the case; he must instead show a probability that the errors

---

[81] *Strickland v. Washington*, 466 U.S. 668, 687 (1984).
[82] *Id.*
[83] *See, e.g., Martin v. McCotter*, 796 F.2d 813, 816 (5th Cir. 1986).
[84] *See, e.g., Bridge v. Lynaugh*, 838 F.2d 770, 773 (5th Cir. 1988).
[85] *Martin*, 796 F.2d at 817.
[86] *Bridge*, 838 F.2d at 773; *Martin*, 796 F.2d at 816.
[87] *Earvin v. Lynaugh*, 860 F.2d 623, 627 (5th Cir. 1988).
[88] *Strickland*, 466 U.S. at 693.
[89] *Martin*, 796 F.2d at 816.

are "sufficient to undermine confidence in the outcome."[90] A habeas petitioner must "affirmatively prove," not just allege, prejudice.[91]  Both the *Strickland* standard for ineffective assistance of counsel and the standard for federal habeas review of state court decisions under 28 U.S.C. § 2254(d)(1) are highly deferential, and when the two apply together, the review by federal courts is "doubly deferential."[92]

### 1.  Trial Counsel

Petitioner contends that trial counsel was ineffective for failing to move the court to order further DNA analysis on the baseball bat,[93] for failing to investigate,[94] and failing to use the "stand your ground defense."[95]  Regarding the DNA analysis, the Commissioner "agreed" with the State's assessment that trial counsel thoroughly cross-examined Ms. Rash regarding the DNA evidence."[96] Trial counsel's alleged failure in seeking additional DNA testing is analyzed under the same standard as Petitioner's failure to investigate claim, discussed below.[97]  In assessing the reasonableness of an attorney's investigation, "a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further."[98]  A habeas corpus petitioner who alleges a failure to investigate on the part of his counsel must demonstrate with specificity what the investigation would have revealed and how it would have changed the outcome of his trial.[99]  Here, there is no evidence that

---

[90] *Id*. at 816-17.
[91] *Day v. Quarterman*, 566 F.3d 527, 536 (5th Cir. 2009).
[92] *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).
[93] R. Doc. 1-1, p. 21.
[94] R. Doc. 1-1, p. 22.
[95] R. Doc. 1-1, p. 23.
[96] R. Doc. 16-1, p. 18.
[97] *Foxworth v. Dir., TDCJ-CID*, No. 09-56, 2013 WL 3013585, at *22 (E.D. Tex. June 14, 2013) (claim of ineffective assistance of counsel for failing to obtain DNA testing "is akin to a claim of failure to investigate").
[98] *Wiggins v. Smith*, 539 U.S. 510, 527 (2003).
[99] *See Miller v. Dretke*, 420 F.3d 356, 361 (5th Cir. 2005) (citing *United States v. Green*, 882 F.2d 999, 1003 (5th Cir. 1989)).

additional DNA testing on the bat would have altered the outcome of Petitioner's trial.  Trial counsel elicited testimony from Ms. Rash to the effect that the DNA found on the bat could have been Gaston's.[100]  Indeed, based upon other evidence presented at trial, noted below, further testing could have been more damaging to the defense because it could have prevented counsel from presenting testimony to the effect that Gaston *may* have handled the baseball bat.

Detective Anders testified that he "learned that Mr. Hebert [the father] had brought the bat down. So I wanted just to verify. We took a DNA swab from the bat."[101]  Tammy Rash, the DNA analyst who analyzed the DNA material from the bat, testified regarding the process by which DNA is analyzed and gave detailed testimony regarding the evidence collected from the bat.[102]  She testified that "not very much DNA was present."[103]  She further testified that it appeared as though the DNA on the bat was a mixture from two individuals: Wayne Hebert, Sr. could not be excluded as a contributor, and "the other contributor was present at such a low concentration that a valid DNA profile could not be obtained."[104]  Ms. Rash also testified that the DNA profile generated from the bat was "very complicated,"[105] and Petitioner's trial counsel was able to elicit an admission from Ms. Rash that it was possible that Gaston was the contributor to the minor DNA profile on the bat.[106]  Further testing may have precluded this admission.  A strong presumption of reasonableness attaches to trial counsel's decisions, such as whether to conduct more DNA testing.[107]  Trial counsel's decision to not move for further testing could have been reasonable trial strategy, as further DNA testing may have inculpated Petitioner even more and undercut his self-

---

[100] R. Doc. 12-5, p. 172.
[101] R. Doc. 12-4, p. 178.
[102] R. Doc. 12-5, pp. 94-
[103] R. Doc. 12-5, p. 120.
[104] R. Doc. 12-5, pp. 121, 158.
[105] R. Doc. 12-5, p. 143-44.
[106] R. Doc. 12-5, p. 172.
[107] *Wright v. United States*, No. 15-191, 2023 WL 5158052, at *3 (N.D. Tex. Aug. 9, 2023).

defense argument.[108]  Accordingly, counsel was not ineffective for failing to request additional DNA testing, and Petitioner cannot demonstrate prejudice arising from the lack of additional DNA testing.[109]  Accordingly, the Commissioner's conclusion regarding this claim is not unreasonable.

The same standard noted above applies to Petitioner's claim regarding his trial counsel's failure to investigate.  Petitioner alleges trial counsel was "ineffective when he failed to investigate his client's version of the case and obtain copies of his emails."[110]  Petitioner alleges that the emails would have shown that the victim had a motive to attack Petitioner and would have contradicted testimony elicited by the prosecutor to the effect that Petitioner made up information regarding his family in order to "get his parents arrested so that he could have their house."[111]  The emails Petitioner contends should have been introduced are in the record before the Court.[112]

The emails include allegations that Petitioner's father was involved in the assassination of John F. Kennedy and questions whether the information has been covered up.[113]  The emails also allege Petitioner's father, as well as other relatives, are "hardcore Republicans;" that Petitioner is a Democrat; and that Petitioner's father "hates Democrats" and "hates black people."[114]  The emails go on to allege further criminal conspiracies against Petitioner's family, such as being

---

[108] *Id.*; *Skinner v. Quarterman*, 528 F.3d 336, 341-42 (5th Cir. 2008 (counsel was not ineffective for failing to secure DNA test where additional DNA test might undercut a primary defense argument and potentially incriminate the defendant); *Foxworth v. Director, TDCJ-CID*, No. 09-56, 2013 WL 3013585, at *22-23 (E.D. Tex. June 14, 2013) (counsel's alleged error in not obtaining DNA test involved strategic decision that did not rise to level of viable Sixth Amendment claim).

[109] *Williams v. Hines*, No. 11-1511, 2013 WL 5960673, at *20 (E.D. La. Nov. 6, 2013) (finding petitioner failed to prove prejudice under *Strickland*, noting "[a]lthough petitioner claims additional DNA  testing should have been performed, such a claim is purely speculative," as petitioner "fails to show that additional testing would have yielded favorable, exculpatory evidence for him to use at trial"); *Napper v. Thaler*, No. 10-3550, 10-3551, 2012 WL 1965679, at *49 (S.D. Tex. May 31, 2012) ("It follows that petitioner does not establish actual prejudice as the result of his counsel's failure to hire a DNA expert or to pursue additional DNA testing."); *Evans v. Cockrell*, 285 F.3d 370, 377 (5th Cir.2002) (Petitioner has the burden to show "what results the scientific tests would have yielded" and that those results would have been favorable to him).

[110] R. Doc. 1-1, p. 22.

[111] R. Doc. 1-1, p. 22.

[112] *See* R. Doc. 1-3.

[113] *See* R. Doc. 1-3, pp. 1-2.

[114] R. Doc. 1-3, p. 2.

complicit in "acts by other Republicans that are serious federal offenses including drug trafficking, violations of RICO…."[115]   One email is directed to President Barack Obama and Senators Elizabeth Warren, Tammy Baldwin, and Mary Landrieu in which Petitioner states that, because he supported their campaigns, he "expect[s] [their] help now."[116]   Petitioner states in an email that he confronted his adopted father regarding whether he was questioned by anyone regarding the assassination and "word got to" his adopted brother and sister, and within a year, he was getting divorced, and, essentially, losing everything.[117]   Petitioner appears to blame his family, including Gaston, for his life falling apart.   He goes on to allege that various attorneys, "all Republican Party members[,]…were setting [him] up to either get arrested or killed"[118] and that his daughter's death was not "an accident but an intentional act designed to harm me and kill her."[119]   Petitioner also alleges that "every Republican I have named here are at the very least guilty of a hate crime against me for political reasons as I am a registered Democrat."[120]   The email where these allegations appear was forwarded numerous times with Petitioner noting "I am expecting a reply."[121]   He also includes other information in some of the forwarded emails, such as "[t]he last time I went public with this story the Republicans countered with the Monica Lewinsky Affair in 1998. They will not be so lucky this time."[122]

Petitioner's counsel clearly attempted, throughout trial, to exclude particular pieces of evidence related to Petitioner's conspiracy theories regarding his family, as well as his allegation that he was an informant, as his attorney found Petitioner's theories regarding his family to be

---

[115] R. Doc. 1-3, p. 3.
[116] R. Doc. 1-3, p. 3.
[117] R. Doc. 1-3, p. 4.
[118] R. Doc. 1-3, p. 4.
[119] R. Doc. 1-3, p. 6.
[120] R. Doc. 1-3, p. 6.
[121] R. Doc. 1-3, p. 23.
[122] R. Doc. 1-3, p. 28.

prejudicial, and thus, counsel tried to keep this information away from the jury.[123]  It appears to have been a strategic choice.  Strategic choices by counsel "are virtually unchallengeable."[124]  This strategic choice was reasonable considering the fanciful nature of the emails and the fact that the emails were sent in the month leading up to the shooting of Gaston and, as such, very possibly could have been more damaging than helpful to Petitioner.[125]

Regarding Petitioner's last particular claim of ineffective assistance of counsel, that counsel was ineffective for failing to raise a stand-your-ground defense,[126] such a claim also must fail because trial counsel clearly attempted to elicit testimony throughout trial to demonstrate that Petitioner was acting in self-defense/standing his ground when he shot his brother.[127]  For example, he questioned Sergeant Stroughter and elicited testimony that Petitioner "said him and his brother had been arguing all night, he was trying to leave that morning, and his brother came at him with a bat, so he had to shoot him."[128]  Trial counsel also put on testimony to indicate that Gaston may have transported a gun with him from Texas to Louisiana.[129]  As noted by the First Circuit, with respect to the sufficiency of the evidence claim, the jury simply did not buy the self-defense argument—that does not render counsel ineffective.  Defense counsel clearly tried to call into question the father's testimony that he had walked outside with the bat and prompted testimony that indicated it was possible that Gaston was wielding a bat when he was shot, as indicated by the discussion regarding DNA testimony above.[130]

---

[123] *See, e.g.*, R. Docs. 12-4, pp. 84-85; 12-6, pp. 113-115.
[124] *Neal v. Vannoy*, -- F.4th --, 2023 WL 5425588, at *11 (5th Cir. 2023) (quoting *Strickland*, 466 U.S. at 690).
[125] *See* R. Doc. 1-3.
[126] R. Doc. 1-2, p. 67.
[127] *See, e.g.*, R. Doc. 12-4, pp. 104-105.
[128] R. Doc. 12-6, p. 131.
[129] R. Doc. 12-6, p. 150.
[130] *See, e.g.*, R. Doc. 12-5, pp. 8-11.

The Court also notes that trial counsel was clearly well prepared for trial, and a review of the transcript does not reveal that trial counsel was ineffective. Trial counsel vociferously objected and made apt arguments for his client throughout trial.[131] Counsel was also clearly very well prepared for cross-examination of witnesses.[132] Further, considering the emotional and convincing testimony of the mother, along with the other evidence, Petitioner cannot demonstrate that he was prejudiced by any alleged shortcoming of his counsel because the evidence of his guilt, overall, was convincing. Accordingly, Petitioner's claims regarding ineffectiveness of trial counsel fail.

## 2. Appellate Counsel

Finally, Petitioner argues that appellate counsel was ineffective for not raising claims raised in this Petition.[133] As discussed in this Report, none of Petitioner's claims are meritorious. It necessarily follows appellate counsel's assistance was not deficient, and Petitioner was not prejudiced because his appellate counsel did not raise meritless claims on appeal. Thus, this claim is also without merit.

## V. CERTIFICATE OF APPEALABILITY

Should Petitioner seek to appeal, a certificate of appealability should be denied. An appeal may not be taken to the court of appeals from a final order in a habeas corpus proceeding "unless a circuit justice or judge issues a certificate of appealability."[134] Although Petitioner has not yet filed a Notice of Appeal, the Court may address whether he would be entitled to a certificate of appealability.[135] A certificate of appealability may issue only if a habeas petitioner has made a substantial showing of the denial of a constitutional right.[136] In cases where the Court has rejected

---

[131] *See, e.g.*, R. Doc. 12-5, pp. 33-35, 37, 105.
[132] *See, e.g.*, R. Doc. 12-5, pp. 165-170.
[133] R. Doc. 1-2, p. 69.
[134] 28 U.S.C. § 2253(c)(1)(A).
[135] *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000).
[136] 28 U.S.C. § 2253(c)(2).

a petitioner's constitutional claims on procedural grounds, a petitioner must demonstrate that "jurists of reason would find it debatable whether the petition states a valid claim of a denial of constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."[137] In cases where the Court has rejected a petitioner's constitutional claims on substantive grounds, a petitioner must demonstrate that "jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."[138] Here, reasonable jurists would not debate the denial of Petitioner's habeas application or the correctness of the rulings. Accordingly, if Petitioner seeks to pursue an appeal in this case, a certificate of appealability should be denied.

### VI.  RECOMMENDATION

**IT IS RECOMMENDED** that the Petition for Writ of Habeas Corpus by a Prisoner in State Custody, filed by Petitioner Michael Hebert, be **DENIED** and that this proceeding be **DISMISSED WITH PREJUDICE**. Petitioner's claim regarding allowing statements made to his parents to be introduced at trial were not presented as based on federal law grounds in the state court or in this Court and so those claims are not subject to federal habeas review. While Petitioner's remaining claims are properly before this Court, he has failed to show that the state courts' decisions denying those claims were contrary to, or involved an unreasonable application of, federal law or involved unreasonable fact determinations, such that he cannot meet the applicable standard for habeas relief.

---

[137] *Ruiz v. Quarterman*, 460 F.3d 638, 642 (5th Cir. 2006).
[138] *Pippin v. Dretke*, 434 F.3d 782, 787 (5th Cir. 2005), quoting *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).

**IT IS FURTHER RECOMMENDED** that, if Petitioner seeks to pursue an appeal in this case, a certificate of appealability be denied.

Signed in Baton Rouge, Louisiana, on September 13, 2023.

_____

**SCOTT D. JOHNSON**
**UNITED STATES MAGISTRATE JUDGE**